596 So.2d 763 (1992)
Johnnie WATKINS, Appellant,
v.
RESOURCES PROPERTY MANAGEMENT, et al., Appellee.
No. 91-1394.
District Court of Appeal of Florida, First District.
April 2, 1992.
David L. Kahn, Ft. Lauderdale, for appellant.
Anthony J. Beisler, III, Ft. Lauderdale, for appellee.

*764 ON MOTION FOR REHEARING
ERVIN, Judge.
On consideration of claimant's motion for rehearing, we withdraw our opinion of February 13, 1992, and substitute the following opinion therefor. Claimant's motion is otherwise denied.
Claimant, Johnnie Watkins, appeals an order denying his claim for temporary total disability (TTD) benefits, penalties and interest on untimely benefits previously paid, for diagnostic care and treatment of a fractured knee cap, and granting the employer/carrier (E/C), Resources Property Management and Crawford & Company, credit for TTD benefits paid Watkins after June 1, 1990. We affirm claimant's first issue without discussion, but reverse each of the remaining five issues.
Watkins was a maintenance man for the employer on December 12, 1989, when he fell and suffered an injury during the course and scope of his employment. Although it is undisputed that Watkins fractured his right fifth metatarsal and sprained his right ankle as a result of the industrial accident, the parties dispute whether Watkins injured his knee or knees as well. Thereafter, on December 18, he began treatment with Dr. Michael Abrahams, an orthopedic surgeon, and received TTD benefits until Dr. Abrahams' released him to light-duty work in February 1990. He then returned to work until June 1990, when he stopped working because of pain in his left knee. Dr. Abrahams' examinations revealed that Watkins' left kneecap is separated into two large fragments. The physician was uncertain whether this condition was a fracture caused by the accident or was a condition which preexisted the accident, such as bipartite patella. He said that bipartite patella is usually congenital, as opposed to developmental. Thus, although the condition could have preexisted this particular accident, a preexisting congenital knee problem could have been aggravated following the accident, for example, by the claimant favoring his right foot. Dr. Abrahams further stated that a CT scan would be helpful in determining the origin of claimant's condition. Although TTD benefits were resumed between June 1 and October 11, 1990, the carrier refused to authorize the scan recommended by Dr. Abrahams.
The employer retained Dr. Michael Ruddy, an orthopedist, to examine claimant on December 19, 1990. He concluded that Watkins had reached maximum medical improvement (MMI) on December 19, 1990, with no disability and no restrictions regarding the right ankle.
Addressing first the denial of authorization for a CT scan of claimant's left knee, we find no competent, substantial evidence (CSE) to support this denial by the judge of compensation claims (JCC). In concluding that Watkins did not injure his knees at the time of the industrial accident, the JCC stated in his order that claimant probably had suffered an unrelated accident closer in time to that when he reported his left knee pain to Dr. Abrahams in May 1990. The JCC based this conclusion on his belief that Dr. Abrahams had opined that Watkins had suffered a fracture of his left knee, as both Dr. Abrahams and Dr. Ruddy testified it was unlikely that Watkins would not complain of pain until six months after a fracture. However, Dr. Abrahams stated both in his office report and by deposition that the x-ray showed either a fracture or a congenital bipartite division of the patella, and that a CT scan would enable him to determine the cause of the condition. It is well settled that a diagnostic test is compensable when it is conducted to determine the cause of a claimant's symptoms and whether they are related to a compensable accident. Nealy v. City of West Palm Beach, 491 So.2d 585, 586 (Fla. 1st DCA 1986). Any doubts concerning Watkins' credibility regarding when he first began experiencing knee pain were not an adequate basis for rejecting Watkins' claim for diagnostic testing, in that there was clearly CSE that the knee pain may have been an aggravation of his foot injury, hence work-related. Hamilton v. Early Bird Stud Farms, 540 So.2d 134 (Fla. 1st DCA 1989).
*765 Considering next the JCC's denial of TTD benefits between June 1, 1990, when claimant stopped working, and December 19, 1990, the MMI date established by Dr. Ruddy and approved by the JCC, we also find a lack of CSE to support the denial of same. At his November 14, 1990 deposition, Dr. Abrahams testified that Watkins had been TTD from August 22, 1990 until the time of the deposition because of his foot problem. Dr. Abrahams also testified that as a result of the abnormal knee x-ray, he would have taken Watkins off work as of May 31. Although the E/C and the JCC characterized Dr. Abrahams as stating that claimant's difficulties with his foot continued only because of his knee problems, the record shows that Dr. Abrahams merely said that claimant's inability to walk on his left leg, combined with his fracture in the right ankle, "makes the situation and the waters very muddy," but that "his foot problem continues to be a problem and the recovery of his foot problem is not facilitated by having a knee problem on the other side." The JCC also erroneously stated in his order that Dr. Abrahams had represented in a letter to the carrier that Watkins was able to return to work unrestricted in June 1990. The letter the JCC referred to, however, is a questionnaire which the carrier sent to Dr. Abrahams merely asking him to give them a "target date" for an unrestricted work release which Dr. Abrahams set as June 1990. Claimant was therefore entitled to TTD benefits until the date of MMI because the record fails to establish that he was ever released to return to work before such date. Croft v. Donna Jean Packing Co., 579 So.2d 146 (Fla. 1st DCA 1991); Davis v. Phillips & Jordan, 483 So.2d 534 (Fla. 1st DCA 1986).
Concerning claimant's issue regarding that portion of the order granting the E/C a credit for the TTD benefits paid to Watkins between June 1 and October 11, 1990, we find a similar lack of evidence in support thereof. As previously stated, Dr. Abrahams had taken claimant off work as of June 1, and the servicing agent had commenced paying TTD benefits during that time. Because there is no evidence that Watkins was instructed that he could return to work, nor that he should have known that he had been released to work, he cannot be denied TTD benefits for the period in question.
As to claimant's issue regarding his entitlement to receive penalties and interest under Section 440.20, Florida Statutes (1989), due to the E/C's issuance of seven untimely benefit checks, the record shows that a check for benefits for the period December 13, 1989 through December 26, 1989 was paid December 27, 1989; for December 27, 1989 through January 9, 1990, on January 10, 1990; and for the period January 10, 1990 through January 23, 1990, on January 24, 1990. Two additional checks each covered two payment periods: benefits for the period between July 27, 1990 and August 30, 1990 were paid September 5, 1990; and for September 14, 1990 through October 11, 1990, on October 12, 1990. Section 440.20(2) provides that the first installment for total disability "shall become due on the fourteenth day after the employer has knowledge of the injury" (emphasis added), and that compensation should thereafter be paid in biweekly installments. Section 440.20(7) provides a penalty for each installment that is not paid "within fourteen days after it becomes due." (Emphasis added.) It appears from the above statutory authority that a payment "becomes due" on the 14th day of the biweekly period, and that a penalty must be imposed if a payment is not paid within 14 days thereafter. Therefore, although all seven payments were untimely, the three checks that were issued a day after the payment became due are not subject to a penalty. Watkins is entitled to penalties, however, for the two checks containing two payments each, because each check was issued more than 14 days after the first biweekly payment in each period was due.
Furthermore, claimant is entitled to interest on each of the seven untimely payments. The following language in section 440.20(9) differs from 440.20(7) by requiring the E/C to pay interest to the claimant if the E/C issues a benefit check beyond its *766 due date, which, as we stated above, is on the fourteenth day of the biweekly period:
(9) In addition to any other penalties provided by this chapter for late payment, if any installment of compensation is not paid when it becomes due, the employer, carrier, or servicing agent shall pay interest thereon at the rate of 12 percent per year from the date the installment becomes due until it is paid, whether such installment is payable without an order or under the terms of an order. The interest payment shall be the greater of the amount of interest due or $5.
(Emphasis added.) Therefore, Watkins was entitled to the above statutory amount for each of the seven payments at issue, because each was made at least one day after the date the benefit became due. Myers v. Carr Constr. Co., 387 So.2d 417, 418 (Fla. 1st DCA 1980) (interest is payable "from the date the claimant should have received benefits").
Finally, the JCC's order states that Watkins' claim for attorney's fees was reserved for a later determination of the existence of bad faith. However, as of the time of claimant's accident, the necessity of a claimant's showing bad faith had been eliminated from Section 440.34, Florida Statutes (1989). The JCC was therefore obligated to make a finding whether claimant was entitled to attorney's fees and was permitted to reserve for determination only the amount of such fees.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this order.
KAHN and WEBSTER, JJ., concur.